**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CATHERINE SCHLOSS, PATRICIA TATE-JACKSON, AND DARLENE WILSON, individually and as representatives of a class of participants and beneficiaries on behalf of the AT&T Pension Benefit Plan, | Civil Action No. |
| *Plaintiffs*, | **COMPLAINT—CLASS ACTION** |
| v. | JURY TRIAL DEMANDED |
| AT&T INC., AT&T SERVICES, INC., STATE STREET GLOBAL ADVISORS TRUST CO., DENISE R. SISK, AND JOHN DOES 1–5, | |
| *Defendants*. | |

1.      Plaintiffs Catherine Schloss, Patricia Tate-Jackson, and Darlene Wilson, individually and as representatives of a class of similarly situated participants and beneficiaries of the AT&T Pension Benefit Plan (the "Plan"), bring this action against Defendants AT&T Inc. ("AT&T"), and AT&T Services Inc. (collectively the "AT&T Defendants"), State Street Global Advisors Trust Co. ("State Street"), Denise R. Sisk, and John Does 1–5 (collectively the "State Street Defendants"), for breach of fiduciary duties and other violations of the Employee Retirement Income Security Act of 1974 ("ERISA").

2.      ERISA imposes strict standards of conduct on pension plans. Plan fiduciary duties that are "the highest known to the law." *Donovan v. Bierwirth,* 680 F.2d 263, 272 n.8 (2d Cir. 1982). The statute requires fiduciaries to act with both prudence and loyalty, and "solely in the interest of the" employees who participate in the plan. 29 U.S.C. § 1104(a)(1). In other words, fiduciaries must make plan-related decisions with "an eye single to the interests of the

participants and beneficiaries," instead of favoring their own interests. *Bierwirth*, 680 F.2d at 271 (citing Restatement of Trusts 2d § 170 (1959), II Scott on Trusts §170, at 1297–99 (1967), and Bogert, The Law of Trusts and Trustees § 543 (2d ed. 1978)) (citation omitted).

3.      On May 3, 2023, the AT&T Defendants offloaded over $8 billion of pension benefits for 96,000 AT&T retirees and their beneficiaries. AT&T offloaded these defined benefit obligations to Athene Annuity and Life Company and Athene Annuity & Life Assurance Company of New York (collectively "Athene"), a private-equity controlled insurance company with a highly risky offshore structure. As a result of these transactions, Plaintiffs and the similarly situated participants affected by the transaction lost their status as "participants" in the ERISA-governed Plan and consequently are no longer subject to the statute's protections for employee retirement benefits. Although ERISA does not prohibit an employer from offloading pension obligations to an insurance company, ERISA does require that a fiduciary obtain the "safest annuity available." 29 CFR § 2509.95-1.

4.      Instead of selecting the safest possible annuity to ensure that AT&T retirees would have continued financial security, Defendants selected Athene, which is substantially riskier than numerous traditional annuity providers. In selecting Athene instead of the safest annuity available, Defendants favored their own interests over those of the Plan participants and beneficiaries, thereby failing to act with complete that ERISA demands. Athene structured its annuities to generate higher expected returns but at a cost to retirees and their beneficiaries: Athene invested in lower-quality, higher-risk assets without the traditional mix of quality assets to support future benefit obligations. Because the market accounts for risk in pricing investments, it is likely that AT&T saved a substantial sum by selecting Athene instead of the safest annuity available. But AT&T was not alone in furthering its corporate interests. As the

Plan's independent fiduciary, State Street selected an annuity provider with whom it maintained a mutually beneficial relationship. Putting the company's financial interest in saving money ahead of participants' interests in retirement security by selecting a riskier annuity provider is an egregious act of disloyalty. But even if Athene's pricing was not more favorable to AT&T than traditional annuity providers, no prudent fiduciary would select a risker annuity if a safer annuity was available for the same price. By transferring Plaintiffs' pension benefits to Athene, Defendants put AT&T retirees' and their beneficiaries' future retirement benefits at substantial risk of default—a risk for which they were not compensated, and which devalued their pensions.

5.     To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of similarly situated participants and beneficiaries of the Plan, bring this action to obtain appropriate relief for Defendants' ERISA violations, including without limitation disgorgement of the sums involved in the improper transactions and the posting of security, to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

## JURISDICTION AND VENUE

6.     **Subject-matter jurisdiction.** This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action brought under 29 U.S.C. § 1132(a)(2), (a)(3), and (a)(9).

7.     **Standing.** Plaintiffs have standing to bring this action. Each of them has suffered injuries traceable to Defendants' conduct. They have been harmed in having their accrued pension benefits and future retirement payments removed from an ERISA-governed pension plan backed by one of the largest and most stable companies in the United States and placed in the hands of a private-equity controlled insurance company with a highly risky offshore structure.

Plaintiffs are now subject to an increased and significant risk that they will not receive the benefit payments to which they are entitled. Moreover, any rational investor would demand a greater reward for undertaking higher risk. Because Plaintiffs have involuntarily had their retirement benefits exposed to a much higher risk—a risk for which they have received no compensation—Plaintiffs' retirement benefits are less valuable than they were before Plaintiffs were expelled from the Plan. In addition, Plaintiffs have standing to compel Defendants to disgorge any assets derived from its illegal conduct. These injuries may be redressed by this Court. *See* 29 U.S.C. §§ 1109(a), 1132(a)(3), 1132(a)(9).

8. **Venue.** This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the district in which, on information and belief, at least one of the alleged breaches took place, and where at least one Defendant resides or may be found.

## PARTIES

### I. The AT&T Pension Benefit Plan

9. The Plan is a defined benefit, employee pension benefit plan under 29 U.S.C. § 1002(2)(A) and § 1002(35) covering certain management and bargained employees of AT&T and employees of companies from mergers and acquisitions.

10. The Plan was established and maintained under a written document in accordance with 29 U.S.C. § 1102(a)(1).

11. As of 2022, before the buy-out transaction at issue, the Plan covered 393,447 total participants and held approximately $50 billion in assets.

## II.    Plaintiffs

12.    Catherine Schloss resides in Lincoln, California, and was a participant in the Plan under 29 U.S.C. § 1002(7). Ms. Schloss retired in 1998 after working for approximately 36 years as an Operator and Communications Technician for Pacific Telesis and AT&T.

13.    Patricia Tate-Jackson resides in Lawrenceville, Georgia, and was a participant in the Plan under 29 U.S.C. § 1002(7). Ms. Tate-Jackson retired in 2020 after working for approximately 19 years as an ESOD Provisioning Manager for AT&T.

14.    Darlene Wilson resides in Smyrna, Tennessee, and was a participant in the Plan under 29 U.S.C. § 1002(7). Ms. Wilson retired in 2018 after working for approximately 38 years as a Senior Network Support Specialist for AT&T.

## III.   Defendants

15.    Defendant AT&T (NYSE: T) is an independent, publicly traded telecommunications services provider headquartered in Dallas, Texas. AT&T employs approximately 149,900 employees worldwide across more than 250,000 managed locations.[1] In 2023, AT&T recorded $122.43 billion in net sales and $15.62 billion in net earnings.[2]

16.    AT&T is the Plan Sponsor under 29 U.S.C. § 1002(16)(B). AT&T and State Street Global Advisors Trust Company ("State Street") entered into a commitment agreement with Athene under which AT&T agreed to purchase a group annuity contract that would transfer certain of AT&T's defined benefit pension obligations to Athene. As alleged herein, AT&T exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of Plan assets, and/or had

---

[1] *AT&T Energy Management Brief*, 2018, https://www.business.att.com/content/dam/attbusiness/briefs/att-energy-management-brief.pdf; Form 10-K, AT&T Inc., at 9, Dec. 31, 2023.
[2] Form 10-K, AT&T Inc., Dec. 31, 2023,
https://www.sec.gov/ixviewer/ix.html?doc=/Archives/edgar/data/732717/000073271724000009/t-20231231.htm.

discretionary authority or discretionary responsibility in the administration of the Plan and is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

17.     AT&T Services, Inc. ("AT&T Services") is a wholly owned subsidiary of AT&T. AT&T Services is the Plan administrator under 29 U.S.C. § 1002(16)(B) and named fiduciary under 29 U.S.C. § 1102(a). It is responsible for the general administration of the Plan. Accordingly, as alleged herein, AT&T exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of Plan assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan and is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

18.     State Street Global Advisors Trust Co. ("State Street") is a trust company established under the laws of the Commonwealth of Massachusetts. State Street is a wholly owned subsidiary of State Street Bank and Trust Company. State Street is headquartered in Boston, Massachusetts. In connection with the transaction at issue, State Street served as an independent fiduciary to the Plan. As indicated, AT&T and State Street entered into the commitment agreement with Athene for the transaction at issue. Accordingly, as alleged herein, State Street exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of Plan assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan and is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

19.     Denise R. Sisk is Managing Director of State Street Global Advisors, head of State Street's Independent Fiduciary Services Team. The Independent Fiduciary Services Team is responsible for all independent fiduciary transactions, including the transaction at issue. Accordingly, as the head of the Independent Fiduciary Services Team, Ms. Sisk exercised

discretionary authority or discretionary control respecting management of the Plan, exercised

authority or control respecting management or disposition of Plan assets, and/or had

discretionary authority or discretionary responsibility in the administration of the Plan and is a

fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

20.     John Does 1–5 are unknown members of State Street's Independent Fiduciary

Services Team that exercised discretionary authority or discretionary control respecting

management of the Plan, exercised authority or control respecting management or disposition of

Plan assets, and/or had discretionary authority or discretionary responsibility in the

administration of the Plan and is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

21.     Each Defendant is a fiduciary within the meaning of ERISA because selecting an

annuity provider involves an act of discretionary authority over management of a plan or its

assets. *See* 29 U.S.C. § 1002(21)(A), 1102(a).

## ERISA'S FIDUCIARY STANDARDS

22.     ERISA's primary purpose is to protect the retirement security of plan participants

and their beneficiaries. The statute achieves its protective purposes by imposing on plan

fiduciaries strict standards of conduct derived from the common law of trusts, most notably a

duty of loyalty and a duty of prudence 29 U.S.C.  § 1104(a), (1). The statute states, in relevant

part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of
> the participants and beneficiaries and –
>
> (A)  for the exclusive purpose of
>
>      (i)     providing benefits to participants and their beneficiaries; and
>
>      (ii)    defraying reasonable expenses of administering the plan; [and]

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

23.     The Department of Labor has issued regulatory guidance, known as Interpretive Bulletin 95-1, setting forth its view of the legal standard imposed by § 1104(a)(1)(A) and (B) as it relates to a fiduciary's selection of an annuity provider in connection with a pension risk transfer. 29 CFR § 2509.95-1. Among other requirements, to fulfill the duties to act solely in the interest of participants and for the exclusive purpose of providing benefits, fiduciaries generally must take steps calculated to obtain "the safest annuity available." *Id.* Fulfilling the duty of prudence requires an objective, thorough, and analytical search for an annuity provider.

24.     The general fiduciary duties imposed by 29 U.S.C. § 1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. § 1106 and are considered *per se* violations because they entail a high potential for abuse, including self-dealing transactions and transactions with "parties in interest," defined to include "those entities that a fiduciary may be inclined to favor at the expense of the plan beneficiaries." *Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241−42 (2000); 29 U.S.C. § 1106(a)–(b); 29 U.S.C. § 1002(14).

## FACTS APPLICABLE TO ALL COUNTS

## I.     Pension Risk Transfers ("PRT")

25.     "Defined contribution plans dominate the retirement plan scene today." *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008). Before defined contribution plans became the norm, defined benefit plans (or pension plans) dominated the retirement landscape. They were America's retirement system when ERISA was enacted in 1974.

26.     Pension plans provide employees and retirees with a fixed, guaranteed benefit (typically a monthly payment) after retirement. Employers are generally responsible for funding the pension plan to pay their benefit obligations to employees and retirees. The amount of retirement benefits provided to employees is based on a formula including factors such as salary and years of service.

27.     A fundamental difference between traditional pension plans and defined contribution plans is which party bears the risk of underperformance. In a pension plan, the employer (or plan sponsor) bears the risk. If plan assets are inadequate to satisfy liabilities for benefit payments, it is the employer's obligation to make additional contributions to the plan to meet ERISA's funding requirements. In a defined-contribution plan, by contrast, the employee's benefit is limited to the value of an individual investment account, meaning the risk of underperformance falls on the employee.

28.     In recent years, there has been an industry-wide uptick in employers seeking to reduce their pension funding risk through pension risk transfer ("PRT") transactions.[3] In a PRT transaction, an employer offloads all or part of its pension benefit obligations by using plan assets to purchase an annuity from an insurer, who then assumes the responsibility of future benefit payments to employees and retirees covered by the transaction.

29.     A plan sponsor's selection of an annuity provider to whom it transfers its pension obligations is a fiduciary function, and a critically important one. This single decision will have a lasting impact on retirees and their beneficiaries over an extended period. As NISA Investment

---

[3] ERISA Advisory Council, *Department of Labor Employee Benefits Security Administration Interpretive Bulletin 95-1 Consultation Paper*, at 9 (July 2023).

Advisors noted: it "is one of the most consequential decisions a fiduciary can make because it fundamentally changes the nature of the promised pension benefit."[4]

30.      PRT transactions can take two forms: (1) total buyouts, "in which the plan sponsor terminates the plan and transfers all of the benefit obligations to an insurer through purchase of an annuity contract;" or (2) partial buyouts, in which plan sponsors purchase an annuity from an insurance company to satisfy benefit payments to a select group of participants.[5] As discussed below, the AT&T transaction at issue involved a partial buyout.

31.      In the United States, the PRT market has exploded in recent years, with total PRT premiums growing to $51.8 billion in 2022, up from $27.5 billion in 2018.[6] In a PRT poll conducted by MetLife in 2023, 9 in 10 companies reported that they planned to "completely divest all of their DB pension plan liabilities in an average of 4.1 years."[7]

## II.   The Risks Associated with PRT Transactions

### A.   Lack of ERISA and PBGC Protections

32.      An employer that transfers its pension benefit obligations to an annuity provider causes participants to lose protections under ERISA. PRT transactions transfer pension obligations "from ERISA-regulated defined benefit plans to state-law governed insurance companies."[8] With few exceptions, ERISA-governed defined benefit plans are protected by the

---

[4] Eichorn, David, *Interpretive Bulletin 95-1 Statement and Request to Testify*, July 6, 2023.
[5] ERISA Advisory Council, *Department of Labor Employee Benefits Security Administration Interpretive Bulletin 95-1 Consultation Paper*, at 1 (July 2023).
[6] Aon, *U.S. Pension Risk Transfer Market Insights*, https://www.aon.com/insights/reports/2023/us-pension-risk-transfer-market-insights#:~:text=According%20to%20Aon's%20U.S.%20Pension,has%20recorded%20in%20a%20decade.
[7] MetLife, *2023 Pension Risk Transfer Poll*, Oct. 3, 2023, https://www.metlife.com/retirement-and-income-solutions/insights/2023-pension-risk-transfer-poll/#:~:text=For%20our%202023%20Pension%20Risk,divesting%20all%20pension%20plan%20liabilities.
[8] Stein, Norman, *Statement of Norman Stein On Behalf of the Pension Rights Center Before the ERISA Advisory Council On the Subject of 29 Fed. Reg. 2509.95-1 and Risks to Participants of Pension-Risk Transfers*, July 10, 2023, at 2.

Pension Benefit Guaranty Corporation ("PBGC").[9] When a PRT transaction occurs, affected pensioners lose both their ERISA and their PBGC protections, and are instead only protected by state guaranty associations ("SGAs").[10]

33.     ERISA-governed defined benefit plans are required to pay PBGC premiums, which fund the PBGC so that pensioners will be protected if their plan sponsor becomes insolvent. Since PRT transactions remove PBGC protections, they also remove PBGC premium obligations. Not only does this leave affected pensioners uncovered, but it poses a funding risk to the PBGC and therefore threatens the level of protection applied to plans still protected by the PBGC.

34.     SGAs are not pre-funded like the PBGC and thus offer less protection compared to SGAs. SGAs are funded by assessments of member insurers in the case of another insurer's declaring insolvency. SGAs also only provide coverage up to state law limits rather than one standard limit as defined by the PBGC.[11] In most states, this limit is set to $250,000 "in present value of annuity benefits," which a pensioner could exhaust in mere years if their insurer becomes insolvent.[12]

**B.    Risk of Insolvency and Executive Life**

35.     The risk of insurance company failure is not merely hypothetical. The collapse of Executive Life Insurance Company ("Executive Life") in the early 1990s demonstrates the potentially catastrophic consequences of high-risk insurance practices.[13] Similar to the alleged

---

[9] Pension Benefit Guaranty Corporation, *PBGC Insurance Coverage*, https://www.pbgc.gov/prac/other-guidance/insurance-coverage#:~:text=Whether%20a%20private%2Dsector%20defined,it%20is%20covered%20by%20PBGC.
[10] ERISA Advisory Council, *Department of Labor Employee Benefits Security Administration Interpretive Bulletin 95-1 Consultation Paper*, July 14, 2023, at 33.
[11] *Id.* at 33–34.
[12] National Association of Insurance Commissioners, *Receiver's Handbook for Insurance Company Insolvencies* Chapter 6—Guaranty Funds/Associations, 2024 Ed., at 214.
[13] Eichorn, David, *Interpretive Bulletin 95-1 Statement and Request to Testify*, July 6, 2023.

conduct involving Athene, Executive Life was able to secure billions of dollars in assets and hundreds of thousands of policyholders by seizing on a competitive advantage: declaring interest rates on single-premium, deferred annuities that far exceeded industry averages.

36.     Executive Life held an A+ rating for financial soundness in 1982, attracting over 300,000 policyholders by 1991 who relied on it for regular payments.[14] But in 1990, Executive Life's bond portfolio "cratered amid a bond market meltdown," and in 1991 was seized by the California insurance commissioner who proceeded to sell Executive Life's investment portfolio to Leon Black, co-founder of Apollo Global Management ("Apollo"), for "roughly 50 cents on the dollar."[15] The losses to policyholders as a direct result of the Executive Life takeover were extreme, with policyholder damages estimated at $3.9 billion.[16]

37.     Leon Black was the co-head of brokerage firm Drexel Burnham Lambert ("Drexel").[17]  First Executive Corp., the parent company of Executive Life of California and Executive Life of New York, was "one of Drexel's largest buyers of junk bonds."[18] In contrast to most insurance companies that invested in "stable assets like high-grade bonds, mortgage securities, and government obligations," Executive Life, led by an aggressive money manager, invested in risky junk bonds with high interest rates, which allowed them to make higher payouts to policyholders.[19] Executive Life's portfolio consisted of 60% junk bonds in comparison to the industry-standard 24% at the time of its collapse.[20]

---

[14] Gretchen Morgenson & Joshua Rosner. *These Are the Plunderers: How Private Equity Runs—and Wrecks—America,* at 32–33, Simon & Schuster (2023).
[15] *Id.* at 33–34.
[16] *Id.* at 107.
[17] *Id.* at 47.
[18] *Id.* at 66.
[19] *Id.* at 66–67.
[20] *Id.* at 67.

38.     By 1990, many of the Executive Life assets "held to meet policyholder claims" "were in distress and trading for far less" than their purchase price.[21] However, on December 27, 1990, the NAIC published its findings that Executive Life's California and New York insurers were not in "imminent financial danger" and thus takeovers by state insurance regulators were unnecessary.[22] Executive Life held "impeccable" ratings from major ratings agencies, including an A+ from AM Best and an AAA from Standard & Poor's, which it often mentioned in response to questions from critics regarding the makeup of the Executive Life bond portfolio.[23]

39.     On April 11, 1991, despite the NAIC's recommendation, California Insurance Commissioner John Garamendi seized Executive Life of California "because its precarious financial position made it a threat to its policyholders."[24] Up until a week before the seizure, Executive Life maintained a "contingent B-plus" rating from AM Best, meaning it was still considered to be "'very good'" despite a decline in position pending review. Contrary to ratings agencies' pronouncements, as well as Executive Life's statements that its investments were safe, the New York insurance regulator seized Executive Life of New York on April 17, 1991, and just weeks later parent company First Executive filed for bankruptcy.[25]

C.     **Response to Executive Life and Interpretative Bulletin 95-1**

40.     In response to the financial collapse of Executive Life, Congress passed the Pension Annuitants Protection Act of 1994. *See* Pub. L. No. 103-401 (Oct. 22, 1993). Through the amendment, Congress created a right of action to obtain appropriate relief for ERISA violations involving the "purchase of an insurance contract or insurance annuity," including "the

---

[21] *Id.* at 68.
[22] *Id.* at 71–72.
[23] Demick, Barbara, *A.M. Best finds credibility under fire*, Baltimore Sun, July 28, 1991, updated Oct. 25, 2018, https://www.baltimoresun.com/1991/07/28/a-m-best-finds-credibility-under-fire/.
[24] Gretchen Morgenson & Joshua Rosner. *These Are The Plunderers: How Private Equity Runs—and Wrecks—America,* at 75, Simon & Schuster (2023).
[25] *Id.* at 82–84.

posting of security" as needed to ensure that participants receive their full benefits, plus

prejudgment interest. 29 U.S.C. § 1132(a)(9).

41.     As noted, the Department of Labor's Interpretive Bulletin 95-1 establishes a

framework for ERISA compliance when choosing an annuity provider in a pension risk transfer

transaction.[26] The Department of Labor instructed fiduciaries that they "must take steps

calculated to obtain the safest annuity available, unless under the circumstances it would be in

the interests of participants and beneficiaries to do otherwise."[27]

42.     In order to determine the safest available annuity, Interpretive Bulletin 95-1

requires plan fiduciaries to evaluate the insurer's "claims paying ability and creditworthiness" by

considering six factors: (1) the annuity provider's investment portfolio quality and

diversification; (2) "[t]he size of the insurer relative to the proposed contract;" (3) "[t]he level of

the insurer's capital and surplus;" (4) the insurer's exposure to liability; (5) the structure of the

annuity contract and guarantees supporting them; and (6) the availability of additional protection

through state guaranty associations. The fiduciaries must "obtain the advice of a qualified,

independent expert" if they do not possess the necessary expertise to properly evaluate these

factors.[28]

### D.    Private Equity Firms

43.     Traditional players in the PRT market include established life and annuity

providers, such as Prudential, New York Life Insurance Company, and MetLife. However,

private equity firms have an increasing role in the PRT landscape.  In fact, "private equity firms

have significantly heightened their exposure to and influence over the life and annuity insurance

---

[26] 29 CFR § 2509.95-1.
[27] 29 CFR § 2509.95-1.
[28] ERISA Advisory Council, *Statement of the 2023 Advisory Council on Employee Welfare and Pension Benefit Plans to the U.S. Department of Labor Regarding Interpretive Bulletin 95-1*, Aug. 29, 2023.

industry" overall through both the purchasing of life insurers and their serving as third-party asset managers for insurers.[29] Not only do private equity firms receive cash from premiums that can be invested into their other affiliated businesses, but they can also generate "enormous fees for themselves" for investment management services.[30]

44.     Private equity firms primarily began purchasing insurance companies "to finance their expanding operations."[31] Today, they have moved beyond this business into the lines of private credit and insurance.[32] As of 2023, private equity firms spent almost $40 billion on insurance company purchases and controlled over 7% of the industry's assets, double those that they controlled in 2015.[33]

45.     Such a trend has been concerning to lawmakers and industry experts. On March 16, 2022, Senator Sherrod Brown of Ohio sent a letter to the Federal Insurance Office ("FIO") and the National Association of Insurance Commissioners ("NAIC") expressing his concerns that the "insurance investment products workers depend on for their retirement are being transferred to these risky companies that have a track record of undermining pension and retirement programs."[34]

46.     In the wake of the surge in recent years in life insurer liabilities and annuity sales, such as through PRT transactions, many life insurers "report razor-thin surpluses relative to the

---

[29] Sherrod Brown - U.S. Senator for Ohio, *Brown Continues Push on Private Equity Firms' Involvement in the Insurance Industry*, August 5, 2022, https://www.brown.senate.gov/newsroom/press/release/sherrod-brown-continues-push-private-equity-firms-involvement-insurance-industry.
[30] Gretchen Morgenson & Joshua Rosner. *These Are The Plunderers: How Private Equity Runs—and Wrecks—America,* at 34. Simon & Schuster (2023).
[31] Ballou, Brendan*, Plunder: Private Equity's Plan to Pillage America,* at 125. Hatchette Affairs Public Affairs Group (2023).
[32] *Id.* at 119.
[33] *Id.* at 126.
[34] Brown, Sherrod, *Letter to the Federal Insurance Office and National Association of Insurance Commissioners re: private equity's involvement in life insurance*, Mar. 16, 2022.

size and risk profile of their balance sheets."[35] This "increased use of complex investment strategies[36] has led to the greater prominence of illiquid and volatile assets on insurers' books," a stark contrast to the safe, high-quality corporate bonds that back traditional life insurance policies.[37] These high-risk, "high-yield" investment strategies allow private equity-owned life insurers to boast higher returns than traditional life insurers, making their bids in PRT transactions seem competitively attractive. In reality, "private-equity returns are no better than those for index funds after fees."[38]

## III.   Athene and its Financial Risks

47.     Athene Annuity and Life Company is a subsidiary of Athene Holding, Ltd. The company was founded in 2009 by Apollo executives as an insurance affiliate. Athene Annuity & Life Assurance Company of New York is a wholly owned subsidiary of Athene Annuity and Life Company to conduct insurance business in New York.

48.     Athene is one of the leading players in the PRT market, having completed 45 transactions totaling $50.5 billion and covering over 550,000 plan participants.[39] On March 8, 2021, Apollo announced its merger with Athene, which closed in 2022. At the time, Athene accounted for roughly 40% of Apollo's assets under management and generated 30% of its fee revenue.[40] Following the merger, Athene became a subsidiary of Apollo. As previously indicated, Apollo executives contributed to the collapse of Executive Life.

---

[35] Gober, Thomas, *Testimony to the Department of Labor – Employee Benefits Security Administration Advisory Council on Employee Welfare and Pension Benefit Plans*, at 6, July 10, 2023.
[36] Such complex investment strategies are discussed in further detail in the context of Athene's practices. *See infa* Facts Applicable to All Count, § III.A.
[37] Sherrod Brown - U.S. Senator for Ohio, *Brown Continues Push on Private Equity Firms' Involvement in the Insurance Industry*, Aug. 5, 2022.
[38] Hough, Jack, *How Private Equity Stacks Up Against The Stock Market*, at 9, Barron's, Sept. 18, 2023.
[39] Pension Group Annuities, Athene, https://www.athene.com/pension-group-annuities.
[40] Farman, Madeleine, *Apollo's merger with Athene highlights PE's rush for permanent capital*, S&P Global Market Intelligence, March 25, 2021, https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/apollo-s-merger-with-athene-highlights-pe-s-rush-for-permanent-capital-63263065.

A.   **Athene's Complex Investment Structures and Offshore Practices**

49.     Athene's use of complex investment structures under lax regulatory standards has contributed to its higher risk as an annuity provider.  Athene established subsidiaries Athene Life Re Ltd. and Athene Annuity Re Ltd., offshore captive reinsurers headquartered in Hamilton, Bermuda. In Bermuda, "capital requirements are lower than insurers, investment limitations [are] virtually non-existent and transparency is minimal to zero."[41] In part, this is because regulatory requirements differ between the U.S. and offshore jurisdictions.

50.     In Bermuda, "'[t]he Bermuda Solvency Capital Requirement (BSCR) requires insurers to hold similar levels of capital against both corporate bonds and [Collateralized Loan Obligations, or "CLOs"], even though some CLO tranches have a larger downside risk than bonds with the same credit rating.'"[42] In the United States, the NAIC's Securities Valuation Office ("SVO") "announced changes in how it would calculate capital charges for collateralized loan obligations" in June 2022.[43]

51.     Tom Gober is a forensic accountant, Certified Fraud Examiner, and 13-year Insurance Examiner who has spent 37 years working both for and with government entities, including Mississippi state regulators, the Department of Justice, the U.S. Attorney's Office, and the Federal Bureau of Investigation. Gober has extensively studied PRT transactions by examining life insurers' regulatory filings and looking for evidence of high-quality assets backing liabilities. According to Gober, "'the substance of all troubles I've investigated spin out

---

[41] Gober, Thomas, *Testimony to the Department of Labor – Employee Benefits Security Administration Advisory Council on Employee Welfare and Pension Benefit Plans*, at 2, July 10, 2023.

[42] Hatfield, William, qtd. in Micah Hauptman, *Testimony to the Advisory Council on Employee Welfare and Pension Benefit Plans (ERISA Advisory Council)*, July 18, 2023.

[43] Tipping, Nathan, *How US insurers went to war over CLOs*, Risk.net, Nov. 15, 2023, https://www.risk.net/investing/7958234/how-us-insurers-went-to-war-over-clos#:~:text=These%20insurers%20and%20some%20industry,reputational%20risk%E2%80%9D%20to%20the%20industry.

of unregulated affiliates.'" Gober believes that affiliated transactions, such as those between Athene and Athene Life Re, are some of the biggest issues facing the PRT space.[44]

52.     Furthermore, annuity and life companies maintain surpluses to ensure long-term solvency, but those with captive reinsurers use them "to back their liabilities with assets that would not be admitted by examiners in their own domiciles."[45] Such a practice enables the insurer to appear to have more free capital than it actually does, and the lack of oversight in offshore jurisdictions to ensure solvency and protect the best interests of policyholders leaves the reinsurer's management "free to do virtually anything with the extra funds."[46] As a result, captive reinsurance allows insurers to gain multiple advantages, including to "price their annuities more competitively."[47]

53.     In addition, in the United States, financial statements are required to be reported using Statutory Accounting Principles ("SAP").[48] Bermuda does not follow these same detailed reporting standards. In an analysis of Athene's transfer activity between its affiliates, Gober found that "Athene Annuity Re Ltd of Bermuda ended up with $87 billion on its books in 2020," and circular transactions between Athene and both its offshore and U.S. affiliates totaled $115.7 billion in 2021.[49] Apollo's practice of reinsuring liabilities with its captive reinsurers opens up excess capital but does not decrease risk. If "only a fraction" of that reinsurance transferred in 2021 was backed by letters of credit which were evaluated with SAP and consequently

---

[44] Pechter, Kerry. *NAIC Eyes Bermuda Triangle Strategy*, Retirement Income Journal, Nov. 4, 2021, https://retirementincomejournal.com/article/naic-eyes-bermuda-triangle-strategy/.
[45] Gober, Thomas, *Testimony to the Department of Labor – Employee Benefits Security Administration Advisory Council on Employee Welfare and Pension Benefit Plans*, at 4, July 10, 2023.
[46] *Id.* at 4.
[47] Pechter, Kerry, *NAIC Eyes Bermuda Triangle Strategy,* Retirement Income Journal, Nov. 4, 2021, https://retirementincomejournal.com/article/naic-eyes-bermuda-triangle-strategy/.
[48] Hauptman, Micah, *Testimony to the Advisory Council on Employee Welfare and Pension Benefit Plans*, ERISA Advisory Council, July 18, 2023.
[49] Komisar, Lucy. *Captives of Industry: How Wall Street is Cashing in on Your Insurance*, 100 Reporters, https://100r.org/2022/09/insurance-company-captives/.

disallowed, "Athene would face a funding shortfall." According to Gober, a funding shortfall for Athene would spell trouble for Apollo as well: at the time of Gober's calculations, Athene Holding's insurance companies represented 40% of Apollo's value.[50]

54.     Athene's complex structure has led to an increased exposure to higher risk investments. Financial entities that combine U.S. life insurers (Athene), offshore captive reinsurers (Athene Life Re), and asset manager (Athene Asset Management) employ what is called a "Bermuda Triangle Strategy."[51] The insurer (*e.g.,* Athene) firsts builds a block of annuity business, often through a pension buy-out, then cedes its insurance liabilities to an affiliated offshore reinsurer (*e.g.,* Athene Life Re), "[freeing] up annuity capital for redeployment to its private debt business."[52] The affiliated asset manager (*e.g.,* Athene Asset Management) then originates, acquires, and manages private debt, allowing the insurer to "earn[] a spread that includes an illiquidity premium," which serves as compensation for the additional risk of holding a less liquid asset.[53] The liquidity premium is captured through "thinly-traded risky assets," notably CLOs.[54] Insurers invest directly in private commercial and residential mortgage loans held on-balance sheet before securitizing them into off-balance sheet structured products known as CLOs.[55] Not only are CLOs inherently risky, but insurance companies such as Athene "hold some of the riskiest portions of the CLOs issued by their own affiliate asset managers."[56]

55.     In its Form ADV Part 2A filed with the Securities and Exchange Commission, Apollo specifically recognized the conflicts of interests that arise in PRT transactions involving

---

[50] *Id.*

[51] Nathan Foley-Fisher, et al., *Capturing the Illiquidity Premium,* Feb. 2020, at 6–9; *see also* Kerry Pechter, *NAIC Eyes Bermuda Triangle Strategy,* Retirement Income Journal, Nov. 4, 2021. Apollo manages substantially all of Athene's assets.

[52] *Id.* at 4–5.

[53] *Id.* at 5.

[54] *Id.* at 21.

[55] *Id.*

[56] *Id.* at 4.

its affiliated companies. "Such PRTs could give rise to conflicts of interest, such as determining the purchase price to be paid, the amount of investment management/advisory fees that certain Apollo affiliates charge for managing the underlying pension assets and liabilities on behalf of the Insurance Company PortCos and resolution of disputes that arise in the future."[57] Although there are efforts that can be taken to mitigate these conflicts, Apollo has not done so.

56.    In response to these trends, the International Monetary Fund issued a Global Financial Stability note in December 2023. It warned of portfolio liquidation challenges due to the increased use of structured investments. "Greater investment in structured and private credit worsens liquidity mismatches between assets and liabilities, which could make liquidating portfolios more challenging if facing margin calls on derivatives or repurchase agreement contracts or policy surrenders should interest rates continue to rise rapidly."[58]

## B.    Private Equity Concerns

57.    The United States Private Equity Council named Apollo one of the top ten private equity firms in 2022.[59] Like with other private equity-owned insurers, Athene's rapidly increasing role in the PRT market has been cause for concern for many industry experts. The mission of private equity does not align with the best interests of policyholders. "Private equity firms' 'focus is on maximizing their immediate financial returns, rather than ensuring that promised retirement benefits are there at the end of the day for policyholders,'" which as a business model "'is not necessarily a natural fit for the insurance business, where a failure can put policyholders at very significant risk.'"[60]

---

[57] Apollo Capital Management, L.P., Form ADV Part 2A, June 2, 2023, at 191.
[58] Fabio Cortes, et al., *Private Equity and Life Insurers,* International Monetary Fund Global Financial Stability Note, Dec. 2023, at 14.
[59] United States Private Equity Council, *Apollo Global Management*, https://www.uspec.org/private-equity-firms/apollo-global-management, (2024).
[60] Ballou, Brendan, *Plunder: Private Equity's Plan to Pillage America,* Hatchette Affairs Public Affairs Group, at 127 (2023).

58.     The United States Department of the Treasury expressed similar concerns, writing that it merits further consideration "whether a potential misalignment may exist between the shorter-term objectives/strategy of the alternative asset manager investment model and the long-term commitment necessary for fulfilling annuity/life insurance policyholder interests."[61] Apollo specifically "was, in many ways, culturally ill suited" to create and run Athene. Its reputation as "cutthroat" and "bare-knuckled" does not align with the historically conservative nature of life insurance, which should be primarily concerned with fulfilling policyholder obligations.[62]

59.     Under the direction of Section 321 of the SECURE 2.0 Act of 2022, the Department of Labor conducted a review of Interpretive Bulletin 95-1 and consulted with the Advisory Council on Employee Welfare and Pension Benefit Plans "to determine whether updates to Interpretive Bulletin 95-1 [were] warranted."[63] On July 18, 2023, the Council held a meeting at which they consulted with the Employee Benefits Security Administration and heard public comments. At the hearing, stakeholders raised several concerns surrounding private equity's increasing role in the insurance and annuity industry, including high investment management fees, conflicts of interest, and the introduction of new risk.[64] Bill Wheeler and Sean Brennan of Athene testified that Athene is "'the most transparent'" life insurer, which forensic accountant and Certified Fraud Examiner Tom Gober described as "'the opposite of the truth.'"[65]

---

[61] Department of the Treasury, *Letter from Jonathan C. Davidson, U.S. Department of the Treasury, to Senator Sherrod Brown*, June 29, 2022, https://www.banking.senate.gov/imo/media/doc/fio_85.pdf.
[62] Ballou, Brendan *Plunder: Private Equity's Plan to Pillage America,* p. 127. Hatchette Affairs Public Affairs Group, 2023.
[63] U.S. Department of Labor Employee Benefits Security Administration, *ERISA Advisory Council*, https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council.
[64] ERISA Advisory Council, *Department of Labor Employee Benefits Security Administration Interpretive Bulletin 95-1 Consultation Paper*, at 14 (July 2023).
[65] Pechter, Kerry, *Of Athene, Pension Risk Transfers, and Fiduciaries*, Retirement Income Journal, July 28, 2023, https://retirementincomejournal.com/article/of-private-equity-and-pension-risk-transfers/.

**C.    Athene's Creditworthiness**

60.    On October 13, 2022, NISA Investment Advisors reported the results of a study to evaluate the creditworthiness of nine PRT insurance providers, including Athene.[66] To perform the evaluation, NISA computed the credit spread differences "between insurers into the implied cost that beneficiaries bear to individual insurance companies," finding "the range of credit risk costs reaching as high as 14%."[67] As shown below, NISA quantified the economic loss to beneficiaries due to credit risk, placing Athene dead last, and among "Questionable Candidates" for an annuity provider.

**FIGURE 2. Quantifying the Economic Loss to Beneficiaries (ELB) Due to Credit Risk**

| Issuer | Observed Market Spread | Market Price of Bond's Risks Over Treasuries | Economic Loss to Beneficiaries (ELB) of Choosing Insurer | Market Assessment of Safest Annuity Available |
|---|---|---|---|---|
| (A) NY Life | 74 | 7.4% | 0.0% | CLEAR CANDIDATES |
| (B) Prudential | 76 | 7.6% | 0.2% | |
| (C) MassMutual | 84 | 8.4% | 1.0% | |
| (D) AIG | 102 | 10.2% | 2.8% | POTENTIAL CANDIDATES BUT EXTRA SCRUTINY REQUIRED |
| (E) MetLife | 106 | 10.6% | 3.2% | |
| (F) Principal | 147 | 14.7% | 7.3% | |
| (G) PacLife | 158 | 15.8% | 8.4% | QUESTIONABLE CANDIDATES: DEMANDS EXTENUATING CIRCUMSTANCES |
| (H) F&G | 186 | 18.6% | 11.2% | |
| (I) Athene | 214 | 21.4% | 14.0% | |

Source: Bloomberg, NISA calculations.

61.    The 14% figure measuring the economic loss to beneficiaries of choosing Athene demonstrates that Athene is a much riskier annuity provider than traditional providers, like New

---

[66] Eichorn, David, *Pension Risk Transfers (PRT) May Be Transferring Risk to Beneficiaries*, NISA, 2022, https://www.nisa.com/perspectives/pension-risk-transfers-prt-may-be-transferring-risk-to-beneficiaries/.
[67] *Id.*

York Life and Prudential, and should not be considered the "safest available" annuity as required by Interpretive Bulletin 95-1.[68]

62.     NISA Investment Advisors also reported the range of "creditworthiness" among annuity providers, reporting that Athene had the highest reported spread of 214 basis points ("bps").[69] Spread refers to the difference in yield between a given bond and U.S. Treasuries. The bond market uses the spread to measure the creditworthiness of bonds issued by insurers because there is an inverse relationship between spread and credit rating. Accordingly, all else equal, an investor demands additional compensation for taking more credit risk to hold one bond that has a higher spread than another bond from a different issuer with a lower spread.

**D.     Athene's Credit Ratings and Other Red Flags**

63.     Interpretive Bulletin 95-1 makes clear that "[a]lthough ratings provided by insurance rating services may be a useful factor in evaluating a potential annuity provider, reliance solely on such ratings would not be sufficient to meet the requirement of a thorough and analytical search for an appropriate annuity provider."[70] In light of this guidance, NISA Investment Advisors separately compared the agency rating of Athene to the market-adjusted implied rating. NISA Investment Advisors found that although Athene had an agency rating of A+, its implied rating was BBB-, the lowest rating among all reported annuity providers. [71] Accordingly, reliance on Athene's credit ratings would be insufficient to appropriately evaluate whether Athene offered the safest annuity available.

64.     Athene's transition out of the life insurance business further contributes to its higher risk as an annuity provider. An insurance company that provides life insurance is

---

[68] *Id.*
[69] *Id.,* Figure 1.
[70] 29 CFR § 2509.95-1.
[71] Eichorn, David, *Pension Risk Transfers (PRT) May Be Transferring Risk to Beneficiaries*, NISA, 2022, Figure 1.

considered a natural hedge to an annuities business.[72] In 2013, most of Athene's life insurance business was acquired by another company, Accordia Life and Annuity Company, and by 2016, Athene completely transitioned out of the business. Therefore, the important hedge to Athene's annuities business of providing life insurance no longer exists.

65.     Athene also has been under regulatory investigation. In January 2019, the New York State Department of Financial Services initiated an investigation into Athene Annuity and Life Company and Athene Holding Ltd. regarding their pension risk transfer business in New York state.[73] Relative to other states, New York state maintains some of the strictest standards on insurers. As a result of the investigation, they were ordered to pay a $45 million civil monetary penalty and meet other provisions.

## IV.   The Conflicted Relationships of AT&T, State Street, and Athene

66.     State Street and its affiliates have had a longstanding corporate relationship with AT&T. Apart from AT&T's defined benefit plans, State Street and its affiliates have provided trustee, investment manager, and independent fiduciary services for the AT&T Stock Fund in AT&T's defined contribution plans. In addition, between 2016 and 2020, State Street was paid over $9,000,000 for services performed for the AT&T Savings Plan Master Trust.[74] State Street is also ranked as the third largest institutional shareholder of AT&T, owning 305,826,819 shares of

---

[72] "Life insurance companies' investment policies tend to include longer-maturity, investment-grade bonds that provide stable cash flow to match their long-term liabilities." Nancy Bennett and Paul Navratil, *Solvency and Reserve Standards for U.S. Life Insurance Companies*, American Academy of Actuaries, at 10, July 18, 2023, https://www.actuary.org/sites/default/files/2023-07/American_Academy_of_Actuaries_for_DoL_ERISA_Advisory_Council.pdf.
[73] *In the Matter of Athene Annuity and Life Company and Athene Holding Ltd.,* Consent Order, Apr. 13, 2020, https://www.dfs.ny.gov/system/files/documents/2020/04/ea20200413_consent_order_athene.pdf.
[74] *See* 2016–2022 Forms 5500 for the AT&T Savings Plan Master Trust.

AT&T valued at $5,202,114,000 as of December 31, 2013.[75] State Street maintained the same ranking among institutional investors in 2022.

67.     State Street and Athene also have a corporate relationship. State Street is one of the largest shareholders of Athene's parent company, Apollo. As of December 31, 2023, State Street was the seventh largest institutional investor of Apollo, owning 10.31 million shares valued at $1.1 billion.[76] According to financial statements of Athene Annuity & Life Assurance Company published by the Insurance Department of the State of New York for the first quarter of 2023, State Street provides custodial services for Athene insurance products.

68.     State Street also has been critical to the success of Athene's business. Athene currently reports that it has completed 45 PRT transactions.[77] State Street recommended or selected Athene in many of these transactions in the role of a purportedly "independent" fiduciary. Separately, in April 2023, State Street announced the launch of a new target-date fund series with a retirement income annuity called the State Street GTC Retirement Income Builder Series.[78] Athene was selected as one of two of the early insurers to back this series.

## V.    Defendants' PRT Transactions with Athene

69.     Through the PRT with Athene, AT&T Defendants transferred pension liabilities to Athene Annuity and Life Company or Athene Annuity & Life Assurance Company of New York (collectively "Athene").[79] AT&T therefore no longer guarantees the pension benefits covered by the transaction, which are no longer subject to ERISA's funding requirement. As a result, AT&T

---

[75] AT&T Inc. Institutional Holdings, Nasdaq, Dec. 31, 2023, https://www.nasdaq.com/market-activity/stocks/t/institutional-holdings.

[76] Apollo Global Management, Inc. Institutional Holdings, Nasdaq, Dec. 31, 2023, https://www.nasdaq.com/market-activity/stocks/apo/institutional-holdings

[77] Pension Group Annuities, Athene.

[78] Alex Ortolani, *State Street Partners with Annexus for Retirement Income TDF,* PlanSponsor, Apr. 19, 2023, https://www.plansponsor.com/state-street-partners-with-annexus-for-retirement-income-tdf.

[79] Athene Annuity and Life Assurance Company of New York is a subsidiary of Athene Annuity and Life Company, which provides annuity benefits to Plan participants who reside in New York.

caused Plan participants to lose the stringent protections under ERISA and placed their retirement assets at risk of Athene's insolvency.

70.     On April 26, 2023, AT&T and State Street entered into a PRT commitment agreement with Athene under which AT&T agreed to purchase "nonparticipating single premium group annuity contracts" ("GACs") that transferred certain of the Plan's defined benefit pension obligations to Athene.[80] State Street acted as an independent fiduciary to the Plan over the transaction and purchase of the GACs with Athene. State Street received fees for providing these services.

71.     The PRT transaction with Athene closed on May 3, 2023. The transaction involved approximately 96,000 AT&T participants and beneficiaries and $8.05 billion in transferred benefit obligations.[81] The purchase of the GACs was funded from Plan assets, which required no additional contributions from AT&T.

72.     Importantly, AT&T and State Street structured the PRT transaction to cover retirees who had lower salaries during their tenures, and thus, accrued lower pension benefits. The deal specifically affected union and non-union retirees whose single life annuity payments are less than $2,200 per month.[82] Accordingly, the transaction did not affect higher-income AT&T retirees.

73.     Shortly after the PRT with Athene was announced, Julliane Galloway, AT&T Vice President of Global Benefits, was interviewed about the transfer in a communication sent to affected plan participants.[83] AT&T retirees were informed that reinsurance was not included in

---

[80] AT&T, Form 8-K, May 3, 2023,
https://www.sec.gov/ixviewer/ix.html?doc=/Archives/edgar/data/0000732717/000073271723000026/t-20230503.htm.
[81] Id.
[82] TelCo Retirees Association, Inc., *AT&T Moved 96,000 Retirees to Athene*, https://www.telcoretirees.org/nrln-2/.
[83] Id.

the agreement with Athene, and thus, the entire risk of future pension benefits was left "on the backs of the retirees" and Athene "has no obligation to continue management and could resell [the annuity] to someone else with even less requirements."[84] TelCo Retiree's Association stated that companies take this action to "reduce debt on the balance sheet and/or to rid themselves of PBGC insurance premiums."[85] The PBGC's guarantee of Plan participants' benefits simply ended.

74.    AT&T's and State Street's PRT transaction with Athene was critical to Athene's success for the year. It represented approximately 80% of Athene's sales, or $8.05 billion of the $10.4 billion Athene reported for pension group annuity sales.[86]

75.    When the PRT transaction was announced, AT&T expected to "recognize a one-time non-cash pre-tax pension settlement gain of approximately $350 million in the second quarter of 2023."[87] The pre-tax settlement gain was ultimately valued at $363 million.[88] In addition, AT&T will financially benefit from avoiding annual PBGC premiums for retirees who were eliminated from the Plan.

## VI. Defendants Acted in their Own Self-Interest in Transferring AT&T's Pension Obligations to Athene

76.    Defendants violated their strict fiduciary duties by selecting and then offloading billions of dollars of Plan participants' retirement assets to Athene. They failed to select the

---

[84] *Id.*

[85] *Id.*

[86] *Athene USA Tops Rankings for Annuity Sales,* Pension Group Annuity Volumes, https://www.athene.com/news/annuities-news/2024/athene-usa-tops-rankings-for-annuity-sales-pension-group-annuity-volumes.html.

[87] AT&T Inc., Form 8-K, May 3, 2023, https://www.sec.gov/ixviewer/ix.html?doc=/Archives/edgar/data/0000732717/000073271723000026/t-20230503.htm.

[88] AT&T Inc., Form 10-Q, June 30, 2023, https://www.sec.gov/ixviewer/ix.html?doc=/Archives/edgar/data/0000732717/000073271723000047/t-20230630.htm.

safest annuity provider available. Relative to traditional annuity providers, Athene invests in far riskier assets. This risk is compounded by numerous factors, including Athene's reinsurance of annuities with offshore affiliates. In a market with no shortage of stable and established annuity providers, no prudent and loyal fiduciary under the circumstances would have offloaded billions of participants' retirement benefits to Athene.

77.    In light of the extensive information available to Defendants regarding the creditworthiness of Athene, and other deficiencies relative to traditional annuity providers, it is evident that Defendants either did not solicit bids from a large number of providers or did not engage in an independent and reasoned decision-making process prior to selecting and transferring pension benefits to Athene. Had they done so, they would not have placed retirees and beneficiaries' retirement assets at risk of Athene's insolvency.

78.    Defendants' decision to use Athene as the annuity provider harmed, and will continue to harm, participants and beneficiaries over an extended period of time through uncompensated risk. The market measures Athene as up to 14% riskier than traditional annuity providers, including New York Life and Prudential. Investors in the market demand a risk premium to compensate them for exposure to higher risk. Plan participants and beneficiaries receive no additional compensation for taking on the additional risk of having their pension benefits placed with Athene.

79.    Given the corporate relationship between State Street and Athene, and the numerous factors that would lead to the rejection of Athene, it is evident that State Street selected Athene without conducting a sufficiently independent and objective evaluation of available annuity providers. Without such an investigation, State Street could not determine whether the

use of Athene as the Plan's annuity provider was prudent or in the best interest of Plan participants.

80.     Interpretive Bulletin 95-1 instructs fiduciaries that while the cost of the annuity will inevitably be considered, "cost consideration may not…justify purchase of an unsafe annuity." Despite this guidance, plan sponsors may still be drawn to private equity-backed insurers who charge a lower price than more traditional insurers to take on the same liabilities. Allison Wielobob, General Counsel for the American Retirement Association and former staff member in the Office of Regulations and Interpretations of the Employee Benefits Security Administration, cautions that "'the plan sponsor may be focused on getting a good price in a transfer transaction. But a plan sponsor engaging in a pension risk transfer… is still an ERISA fiduciary, and is required to act prudently and in the best interests of the plan's participants and beneficiaries.'"[89]

81.     On information and belief, the AT&T Defendants received an economic benefit from the selection of Athene in the form of reduced premium payments relative to what they would have paid to an established and reputable insurance provider, such as Prudential and New York Life. Even if Athene's pricing was not more favorable to AT&T than traditional annuity providers, no prudent fiduciary would select a riskier annuity if a safer annuity was available for the same price. Likewise, in accordance with Interpretive Bulletin 95-1, no prudent fiduciary would rely on Athene's credit ratings when determining the safest annuity.

82.     With the dramatic increase in PRT transactions during 2022 as more firms entered the space, Milliman reported that the spread between average and competitive bids has widened,

---

[89] Iekel, John, *Fiduciary Duty a Factor in Pension Risk Transfers*, American Society of Pension Professionals & Actuaries, August 30, 2023, https://www.asppa.org/news/fiduciary-duty-factor-pension-risk-transfers.

emphasizing the importance of fiduciaries ensuring that low bidders are not taking undue risks.[90]
This wider range in premiums is shown in Figure 1.



83.     Other sources confirm the trend of employers in PRT transactions selecting the lowest cost annuity provider. In 2022, for partial buyouts, such as in the case for AT&T, Aon reported that employers (or plan sponsors) chose the lowest cost annuity in 78% of partial buyout transactions.[91]

## VII.  The AT&T Defendants Imprudently Selected State Street as the Independent Fiduciary

84.     The AT&T Defendants' act of hiring State Street as the Plan's independent fiduciary was a separate violation of their fiduciary responsibilities. AT&T and State Street have maintained a mutually beneficial corporate relationship. On information and belief, the AT&T Defendants failed to engage in a thorough and independent investigation of available independent fiduciaries for the Plan, which would include seeking competitive bids from other

---

[90] Fiona Ng & Tanner McKerlie et. al., *Pension Risk Transfer: Staying Current in a Rapidly Evolving Market*, Milliman, June 23, 2023, https://www.milliman.com/en/insight/pension-risk-transfer-staying-current-evolving-market.
[91] Aon, *U.S. Pension Risk Transfer: Market Insights*, at 12, Mar. 2023, https://www.aon.com/insights/reports/2023/us-pension-risk-transfer-market-insights.

providers to perform these services. The AT&T Defendants simply hired State Street without engaging in a prudent decision-making process.

85.      Had the AT&T Defendants conducted an impartial investigation of available independent fiduciaries, they would have discovered that State Street maintained a broad corporate relationship with Athene and Apollo. It is evident that this relationship impacted the independence of the fiduciary services and advice that State Street provided on behalf of the Plan. There were numerous factors that would lead a loyal and prudent fiduciary to conclude that Athene was not the safest annuity available. However, despite clear evidence that Athene was substantially riskier than traditional annuity providers, State Street approved Athene and contributed to putting AT&T retirees' and their beneficiaries' future retirement benefits at substantial risk of default—a risk for which they were not compensated.

## CLASS ACTION ALLEGATIONS

86.      Plaintiffs seek class action certification on behalf of all participants in the AT&T Pension Benefit Plan and their beneficiaries since March 15, 2018 for whom the responsibility for plan-related benefit payments has been transferred to Athene Annuity and Life Co. or Athene Annuity & Life Assurance Company of New York.

87.      This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.      The proposed class includes over 96,000 members and is so large that joinder of all its members is impracticable.

b.      There are questions of law and fact common to the proposed class, the resolution of which will resolve the validity of all class members' claims, including

whether Defendants violated ERISA in connection with the transactions and, if so, the appropriate remedy for any violation.

c.      Plaintiffs' claims are typical of the claims of the class because all Plaintiffs and all class members were participants in the Plans and were subjected to Defendants' conduct in transferring their benefit payments to the Athene entities.

d.      Plaintiffs are adequate representatives of the proposed class because they are committed to the vigorous representation of the class and prosecution of this action; have engaged experienced and competent attorneys to represent the class; and have no conflicts of interest with members of the proposed class.

e.      The claims herein satisfy the requirements of Rule 23(b)(1) because prosecuting separate actions by individual class members would create a risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants with respect to their obligations to the Plan and members of the proposed class, and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests.  Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

f.      The claims herein also satisfy the requirements of Rule 23(b)(2) because Defendants acted or refused to act in the same manner generally to the class, so that final injunctive or corresponding declaratory relief is appropriate respecting the class as a whole.

g.      Alternatively, the claims herein satisfy the requirements of Rule 23(b)(3)

because common questions of law and fact predominate over individual questions and a

class action is superior to individual actions or other methods of adjudication. Given the

nature of the allegations and Defendants' common course of conduct to the class as a

whole, no class member has an interest in individually controlling the prosecution of this

matter, and Plaintiffs are aware of no difficulties likely to be encountered in the

management of this matter as a class action.

88.     Plaintiffs' counsel, Schlichter Bogard LLP, will fairly and adequately represent

the interests of the class and is best able to represent the interests of the class under Rule 23(g).

The firm has extensive experience in the area of ERISA fiduciary breach litigation and has been

appointed class counsel in over 40 ERISA fiduciary breach actions since 2006. The firm is

recognized "as a pioneer and the leader in the field" of ERISA retirement plan litigation, *Abbott

v. Lockheed Martin Corp.*, No. 06-701, 2015 U.S. Dist. LEXIS 93206, at *4–5 (S.D. Ill. July 17,

2015), and "clearly experts in ERISA litigation." *Tussey v. ABB, Inc*., No. 06-4305, 2012 U.S.

Dist. LEXIS 157428 at 10 (W.D. Mo. Nov. 2, 2012). The firm's work in ERISA class actions has

been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among

other media outlets. *See, e.g.*, Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*,

WALL ST. J. (May 15, 2016);[92] Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. TIMES

(Mar. 29, 2014);[93] Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, WALL ST. J. (Feb. 23,

2015);[94] Floyd Norris, *What a 401(k) Plan Really Owes Employees*,  N.Y. TIMES (Oct. 16,

2014);[95] Sara Randazzo, *Plaintiffs' Lawyer Takes on Retirement Plans*, WALL ST. J. (Aug. 25,

---

[92] *Available at* http://www.wsj.com/articles/401-k-fees-already-low-are-heading-lower-1463304601.
[93] *Available at* http://www.nytimes.com/2014/03/30/business/a-lone-ranger-of-the-401-k-s.html?_r=0.
[94] *Available at* http://www.wsj.com/articles/high-court-spotlight-put-on-401-k-plans-1424716527.
[95] *Available at* http://www.nytimes.com/2014/10/17/business/what-a-401-k-plan-really-owes-employees.html?_r=0.

2015);[96] Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, WALL ST. J. (May 18, 2015); [97] Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014);[98] Mark Miller*, Are 401(k) Fees Too High? The High-Court May Have an Opinion*, REUTERS (May 1, 2014);[99] Greg Stohr, *401(k) Fees at Issue as Court Takes Edison Worker Appeal*, BLOOMBERG (Oct. 2, 2014).[100]

## COUNT I

### Breach of Fiduciary Duties by All Defendants Regarding Athene

89.     Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

90.     Each Defendant acted as a "fiduciary" as defined by ERISA with respect to the Plan and transaction at issue.

91.     As such, Defendants were required to discharge their duties with respect to the Plan "solely in the interest of" and "for the exclusive purpose of providing benefits to" the Plan's participants and beneficiaries and defraying reasonable expenses of administering the Plan, and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(A)–(B).

92.     Interpretive Bulletin 95-1 sets forth the Department of Labor's view of the legal standard imposed by § 1104(a)(1)(A) and (B) as it relates to a fiduciary's selection of an annuity provider in connection with a pension risk transfer. 29 CFR § 2509.95-1. Among other requirements, to fulfill the duties to act solely in the interest of participants and for the exclusive

---

[96] *Available at* http://blogs.wsj.com/law/2015/08/25/plaintiffs-lawyer-takes-on-retirement-plans/.
[97] *Available at* http://www.wsj.com/articles/high-court-ruling-adds-protections-for-investors-in-401-k-plans-1431974139.
[98] *Available at* http://www.npr.org/2014/12/15/370794942/lockheed-martin-case-puts-401-k-plans-on-trial.
[99] *Available at* http://www.reuters.com/article/us-column-miller-401fees-idUSBREA400J220140501.
[100] *Available at* http://www.bloomberg.com/news/articles/2014-10-02/401-k-fees-at-issue-as-court-takes-edison-worker-appeal.

purpose of providing benefits, fiduciaries generally must take steps calculated to obtain "the safest annuity available." Fulfilling the duty of prudence requires an objective, thorough, and analytical search for an annuity provider.

93.     Defendants breached their fiduciary obligations. Based on objective criteria and relative to other providers in the market for plans of the character and size of the Plan, Athene was not the safest annuity available. On information and belief, Defendants selected Athene not because doing so was in the interest of participants, their beneficiaries, and the security of their retirement benefits, but to advance corporate interests by saving AT&T money and enhancing corporate profits. State Street was conflicted and its selection or recommendation of Athene was influenced by its corporate relationships with Athene and affiliated rather than through an objective and thorough independent investigation into the merits of whether using Athene was in the interest of Plan participants. In so doing, Defendants breached their duty of loyalty by favoring their own corporate interests over the participants' interests in a secure retirement. Because the AT&T Defendants' goal and motivation was to save the company money, and State Street to benefit itself and its corporate partner, Defendants' search was biased in favor of the lowest-cost provider and thus not objective or sufficiently thorough or analytical, thereby breaching the duty of prudence.

94.     The harm suffered by Plaintiffs and class members from these breaches of fiduciary duty includes an increased and significant risk that they will not receive the benefit payments to which they are entitled and a decrease in value of their pension benefits due to uncompensated risk.

95.     Defendants are subject to appropriate relief to remedy these breaches of fiduciary duty, including without limitation disgorgement of all ill-gotten profits/cost savings pocketed by

Defendants by virtue of purchasing Athene annuities instead of the safest possible annuity, and the posting of security to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

96.     Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

## COUNT II

**Breach of Fiduciary Duties by AT&T Defendants in Selecting State Street**

97.     Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

98.     ERISA's fiduciary duties apply to the selection of service providers. See 29 U.S.C. § 1104(a)(1)(A)–(B).

99.     AT&T Defendants breached their fiduciary duties by selecting State Street as the Plan's independent fiduciary for purposes of the transaction, in that the selection of State Street was influenced by the companies' existing corporate relationships rather than an objective and thorough investigation of alternatives, and failed to adequately consider how State Street's broad corporate relationship with Athene and Apollo would impair its ability to discharge its duties as an independent fiduciary solely in the interest of the Plan's participants.

100.     AT&T Defendants' fiduciary breaches in selecting an independent fiduciary facilitated the subsequent selection of Athene, resulting in harm to Plaintiffs and class members

from an increased and significant risk that they will not receive the benefit payments to which

they are entitled and a decrease in value of their pension benefits due to uncompensated risk

### COUNT III

### Prohibited Transactions—29 U.S.C. § 1106

101.    Plaintiffs restate and incorporate the allegations contained in the preceding

paragraphs.

102.    ERISA supplements the general fiduciary duties by categorically prohibiting

certain transactions. 29 U.S.C. § 1106(a)(1), (b).

103.    Section 1106(a) prohibits various transactions between a plan and a "party in

interest," which Congress defined to encompass "those entities that a fiduciary might be inclined

to favor at the expense of the plan beneficiaries," *Harris Tr. & Sav. Bank v. Salomon Smith*

*Barney, Inc.,* 530 U.S. 238, 242 (2000), such as employers, other fiduciaries, and service

providers. 29 U.S.C. § 1002(14)(A)–(C).

104.    Section 1106(b) categorically prohibits a fiduciary from engaging in certain

transactions with a plan, which often involve self-dealing.

105.    Athene was a party in interest because it provided services to the Plan. 29 U.S.C.

§ 1002(14)(B). Defendants knowingly caused the Plan to engage in transactions resulting in a

direct or indirect sale or exchange of property between the Plan and Athene; furnishing of

services between the Plan and Athene; or transfers of Plan assets to or for the use by or benefit of

Athene. 29 U.S.C. § 1106(a)(1)(A), (C), (D).

106.    The transactions at issue do not qualify for any exemption from the prohibitions

of § 1106(a). Among other reasons, given the substantial risk that Athene's retention posed to

participants' retirement benefits, Athene received more than reasonable compensation for its services to the Plan.

107.    By using pension trust assets to purchase Athene annuities instead of the safest available annuity so as to increase AT&T's corporate profits, Defendants dealt with the assets of the Plan in their own interest or for their own account; and acted on behalf of a party (AT&T and State Street) whose interest in using a riskier, lower-cost annuity provider were adverse to the interests of the Plan's participants and their beneficiaries in obtaining the safest possible annuity. 29 U.S.C. § 1106(b)(1)–(2).

108.    The harm suffered by Plaintiffs and class members from these prohibited transactions includes an increased and significant risk that they will not receive the benefit payments to which they are entitled and a decrease in value of their pension benefits due to uncompensated risk.

109.    Each Defendant is subject to appropriate relief to remedy these prohibited transactions, including disgorgement of all ill-gotten profits/cost savings pocketed by AT&T by virtue of purchasing Athene annuities instead of the safest possible annuity, and the posting of security to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

110.    Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C.  § 1105(a).

## COUNT III

### Failure to Monitor Fiduciaries

111.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

112.    The AT&T Defendants' fiduciary responsibility for overseeing the Plan included monitoring any other fiduciaries appointed or hired to manage the Plan on a day-to-day basis, including the day-to-day responsibility of selecting service providers such as an annuity provider.

113.    A monitoring fiduciary must ensure that those to whom its fiduciary duties are delegated are performing their delegated duties in compliance with ERISA's fiduciary standards.

114.    The AT&T Defendants breached their fiduciary monitoring duties by failing to ensure that the process of selecting Athene as an annuity provider complied with the fiduciary standards set forth in 29 U.S.C. §§ 1104(a)(1)(A) and (B), and Interpretive Bulletin 95-1.

115.    Had the AT&T Defendants fulfilled their fiduciary monitoring duties, Athene would have been rejected in favor of the safest possible annuity or the AT&T Defendants would have decided not to proceed with the transaction. As a result of these monitoring failures, Plaintiffs and class members suffered harm including an increased and significant risk that they will not receive the benefit payments to which they are entitled and a decrease in value of their pension benefits due to uncompensated risk.

### JURY TRIAL DEMANDED

116.    Pursuant to Fed. R. Civ. P. 38 and the Seventh Amendment to the United States Constitution, Plaintiffs demand a trial by jury and alternatively an advisory jury.

**PRAYER FOR RELIEF**

Based on the foregoing, Plaintiffs, on behalf of the proposed class of similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- Find and declare Defendants have breached its fiduciary duties and caused the prohibited transactions described above;

- Order disgorgement of all sums derived from the improper transactions;

- Order Defendants to post adequate security to assure receipt by Plaintiffs and class members of all retirement benefits covered by Athene annuities, plus prejudgment interest;

- Certify the proposed class, appoint each Plaintiff as a class representative, and appoint Schlichter Bogard LLP as Class Counsel;

- Award to the Plaintiffs and the class their attorney's fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

- Order the payment of interest to the extent it is allowed by law; and

- Grant any other relief as the Court deems appropriate to remedy the ERISA violations.

March 15, 2024                          Respectfully submitted,

/s/ Christopher Naumes
Robert T. Naumes, BBO # 367660
Christopher Naumes, BBO # 671701
NAUMES LAW GROUP
2 Granite Ave, #425
Milton, Massachusetts 02186
617-227-8444
617-696-2437 (fax)
robert@naumeslaw.com
christopher@naumeslaw.com
*Local Counsel for Plaintiffs*


SCHLICHTER BOGARD LLP
Jerome J. Schlichter*
Sean E. Soyars*
Kurt C. Struckhoff*
100 South Fourth Street, Suite 1200
St. Louis, Missouri 63102
Phone: (314) 621-6115, Fax: (314) 621-5934
jschlichter@uselaws.com
ssoyars@uselaws.com
kstruckhoff@uselaws.com

*_Pro Hac Vice_ application forthcoming

*Attorneys for Plaintiffs*